**Randal L. SMITH, Petitioner–Appellant,**

v.

**DIRECTOR OF REVENUE, Respondent–Respondent.**

**No. 28837.**

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 27, 2008.

---

Justin H. Nelson, Garrett & Silvey, of West Plains, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., of Jefferson City, MO, and Heather Rowe, Asst. Atty. Gen., of Springfield, MO, for respondent.

GARY W. LYNCH, Chief Judge.

Following a bench trial, Appellant Randal L. Smith appeals the trial court's judgment affirming the revocation of his driving privileges pursuant to section 577.041,[1] for refusing to submit to chemical testing following his arrest for driving while intoxicated. We affirm the trial court's judgment.

### Factual and Procedural Background

Viewing the facts developed at trial in the light most favorable to the trial court's judgment, as we must, *Jarrell v. Director of Revenue*, 41 S.W.3d 42, 46 (Mo.App. 2001), the following transpired.

On November 17, 2006, Smith was stopped in Mountain View after Missouri State Highway Patrol trooper Logan Elliott observed that Smith "almost traveled off the right side of the roadway[ ]" and failed to signal for a right-hand turn. When trooper Elliott approached Smith's vehicle, he saw beer cans in the back and noticed that Smith's "eyes were bloodshot and watery, and he just kind of was staring." He also detected "a fairly strong odor of intoxicants coming from" the vehicle. When the trooper inquired how much Smith had to drink, Smith responded that he did not know.

Elliott requested that Smith perform field sobriety tests, which included the horizontal gaze nystagmus (HGN) test, walk-and-turn, reciting portions of the alphabet, counting, and a portable breath test. Prior to administering the tests, he questioned Smith regarding any physical conditions which would limit his ability to perform the tests, and Smith indicated there were none. On the HGN test, Elliott observed no smooth pursuit in both eyes, "a distinct nystagmus at maximum deviation," and an "onset of nystagmus before 45 degrees." In performing the walk-and-turn test, Smith started before he was instructed, did not touch heel-to-toe, used his arms for balance, and "made an improper turn." When Elliott requested that Smith recite the alphabet from B to M, Smith recited the correct sequence, but was "very slow and it was slurred when he did it." In counting backward from 101 to 86, Smith was accurate but was again slow, and his speech was slurred. Smith submitted to the portable breath test but was unable to blow correctly on three attempts. A fourth attempt resulted in a sufficient sample and

---

1. References in this opinion to section 577.041 and its subsections are to RSMo Cum.Supp.2005.

indicated that Smith "was positive for alcohol."

On the basis of Smith's poor performance on the field sobriety tests, Elliott determined that Smith was impaired, and Smith was arrested for driving while intoxicated and transported to the Mountain View Police Department. Smith had been asked to remove the chewing tobacco he had in his mouth, and upon arrival at the police station, Elliott instructed Smith to rinse with water. Smith rinsed three times, and Elliott inspected Smith's mouth to verify there was no tobacco remaining. Elliott informed Smith of his rights under *Miranda*[2] and requested that Smith take a breath test for alcohol. Elliott initially testified that he then read "Missouri's Consent [sic] Law" to Smith "word-for-word." Upon further questioning he elaborated that this included informing Smith that "if he refused to take the test, his driver's license would be immediately revoked for one year" and that "evidence of his refusal to take the test may be used against him in a—in a prosecution in a court of law." During the mandated fifteen-minute observation period, Elliott interviewed Smith and asked what he had had to drink, how much, and whether he had smoked any marijuana or ingested any drugs. Smith answered that he had consumed "maybe" five beers and answered in the negative regarding marijuana and drug use. After the fifteen-minute period had run, Elliott requested that Smith submit to a breathalyzer test. Further, Elliott testified that he told Smith that "if he didn't give a good sample, it would be deemed as a refusal[.]"

Smith indicated he was willing to submit. Elliott directed Smith "to take a deep breath, seal [his] lips around the tube, [and] blow until [he was] completely out of air." However, Smith blew a short, hard breath and then stopped. Elliott again told Smith that he had to take a deep breath and blow until he was out of air. Smith "did it again, and then he quickly stopped. And he did that four times total." The breathalyzer produced a reading of "invalid sample." Smith told Elliott he "did the best [he] could." Elliott testified he believed Smith was intentionally "trying to defeat it[,]" marked Smith as having refused, and did not attempt to administer a second breathalyzer test. At that point, Elliott read to Smith "Missouri's Implied Consent Law a second time" and requested that Smith give him a blood sample.

Initially, Smith agreed. However, as they were getting ready to go to the hospital, Smith told Elliott he had changed his mind. At that point, Elliott proceeded to complete the paperwork for Smith's refusal to submit, and when Smith asked Elliott what was going to happen, Elliott explained that his license would be revoked for one year. Smith told him, "Well, I didn't understand that.... I want to go ahead and give a blood sample now." However, Elliott then explained that once Smith refused, the "law says none shall be given." Elliott reported that Smith had refused both the breathalyzer and the blood test. Following Elliott's report, Smith's driving privileges were revoked for a period of one year. Smith petitioned for review in the trial court, and a hearing was held August 21, 2007.

At trial, trooper Elliott was questioned at length regarding his interpretation of the DataMaster breathalyzer's reading of "invalid sample." Elliott testified that he understood that an "invalid sample" reading indicated "that he didn't blow a long enough breath in there." However, upon further examination, Elliott stated that he

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

did not know. On redirect, he testified: "If they give an invalid sample, it's deemed a refusal." Elliott explained that his conclusion that Smith refused to take the breath test "was an obvious one," in that he had administered "several of those tests, and it's obvious when somebody's wanting to give a sample and when they're not."

Smith called Dr. Terry Martinez to testify. The trial court found Dr. Martinez to be "a well credentialed expert in the fields of pharmacology and toxicology." Martinez explained that the DataMaster breathalyzer utilized by trooper Elliott in this case is designed to measure carbon hydroxyl groups present in lower alveolar air from the lungs. The instrument is designed to check for five factors to ensure it is measuring lower alveolar air:

It'll look for, number one, that you blow at least one-and-a-half liters of air; number two, that you'll deliver at least—blow at a rate of at least one-and-a-half liters per minute; number three, it looks for a rate of rise of alcohol; number four, it looks for a plateau in the amount of alcohol; and, number five, it looks for a fall at the end of the—of your breath, meaning you're running out of air.

And then it takes a sample. If it doesn't see all five things, it won't take the sample.

Martinez testified that the "invalid sample" reading obtained from the evidence ticket "means mouth alcohol." The operating guide for the DataMaster states: "If the DataMaster detects some interference substance in the mouth, example, mouth alcohol, while the subject is blowing into the instrument, the test will be aborted. Both the display and the printout will indicate 'invalid sample.'" Such a reading, he stated, does not mean that the subject was not blowing hard enough; rather, had that

been the case, a reading of "insufficient sample" would have been produced. Further, Martinez testified that a subject's failure to blow properly would not produce a reading of "invalid sample." Martinez opined that had the instrument detected tobacco fibers, which contain carbon hydroxyl groups and can retain mouth alcohol for longer periods, the instrument would indicate that mouth alcohol was present. Had it not received a sufficient sample, "the machine would not take a reading. At the end of two minutes, it would just quit."

On cross-examination, Elliott identified Exhibit 1, as a "Breath Alcohol Testing Update," with which he was familiar, issued by the Missouri State Highway Patrol Law Enforcement Academy ("training bulletin"). This exhibit was never offered nor admitted into evidence. However, at the request and direction of Smith's counsel and without objection, Elliott read the following excerpt from page two of this exhibit:

Effective immediately, subjects who submit an invalid breath sample must be afforded another full 15–minute observation period with no oral intake prior to attempted submission of a second breath sample. Members must change the mouthpiece and complete a new operational checklist for the second test. Retain the first checklist and evidence ticket printout as evidence affording the subject the opportunity to submit a breath sample for a chemical analysis.

Smith's counsel questioned Elliott regarding his failure to comply with these provisions. Elliott testified that because he had determined that Smith was trying to avoid blowing correctly and he received the "invalid sample" reading, another sample was not required.

The trial court took the matter under advisement. On September 14, 2007, the

trial court filed its amended judgment affirming the administrative revocation of Smith's driving privileges. This appeal followed.

### Discussion

Smith raises two points on appeal. In his first point, he contends that the trial court erred in affirming the revocation of his driving privileges, in that trooper Elliott failed to provide Smith with a second opportunity to submit a breath sample after the first attempt registered as an "invalid sample," because the state highway patrol's policies and procedures for breathalyzer testing require that a second opportunity be afforded if the first attempt resulted in an invalid sample reading. In support, Smith asserts that "[t]he training bulletin [Exhibit 1] is a rule under Section 536.010[,]" RSMo Cum.Supp.2006, and the trooper's failure to follow the policies of the patrol prevented Smith from providing a valid test result.

Under his second point, Smith claims that the trial court's judgment was in error because trooper Elliott "should have readvised [him] of the implied consent law" before requesting he submit to the blood test. Smith alleged that he did not understand his license could be revoked if he did not submit to the blood test and he promptly consented when he learned he was being treated as refusing to submit. Smith contends that principles of fairness and due process should apply, as the burden on the arresting officer is minimal and it would ensure "that individual's rights are fully protected."

■ "Appellate review is undertaken pursuant to Rule 84.13(d) [3] in that this case was tried before the trial court without a jury." *Burk v. Dir. of Revenue*, 71 S.W.3d 686, 687 (Mo.App.2002). We will affirm the trial court's judgment unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Honeyfield v. Dir. of Revenue*, 140 S.W.3d 192, 195 (Mo.App.2004).

■ Pursuant to section 577.041.4, the revocation of driving privileges for failure to submit to a chemical test is limited to a determination of whether the Director established that: (1) the person was arrested; (2) the arresting officer had reasonable grounds to believe that the person was driving while intoxicated; and (3) the person refused to submit to a chemical test. *Norris v. Dir. of Revenue*, 156 S.W.3d 786, 787 (Mo.App.2005). The Director bears the burden of proof on these elements. *Kisselev v. Dir. of Revenue*, 97 S.W.3d 538, 540 (Mo.App.2003). If one of these three elements is not established, the trial court must order the reinstatement of driving privileges. Section 577.041.5. Here, there is no dispute as to whether Smith was arrested or whether the arresting officer had reasonable grounds to believe he was driving while intoxicated. Only Smith's refusal to submit is at issue.

### Trooper was Authorized to Request Blood Test

■ On Smith's first claim related to the patrolman's failure to follow the procedures set forth in the highway patrol law enforcement academy training bulletin, we do not reach the issue of whether or not the training bulletin, a portion of which was quoted *supra*, is technically a rule under Section 536.010, RSMo Cum.Supp. 2006. The trial court found that even if Smith "did nothing to cause the machine to produce the 'invalid' sample reading, the officer still had the right to request

---

**3.** References to rules are to Missouri Court Rules (2007).

[Smith] to submit to a blood test" under section 577.020.2.[4]  We agree.

■  Section 577.020.1, provides that "[a]ny person who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent to, subject to the provisions of sections 577.019 to 577.041, a chemical test or tests of the person's breath, blood, saliva or urine for the purpose of determining the alcohol or drug content of the person's blood[.]"  Subsection 2 of this statute limits the number of tests to which a driver can be asked to submit to "not more than two such tests arising from the same arrest, incident or charge."  The fact that the implied consent law permits law enforcement to request a suspected intoxicated driver to submit to more than one chemical test "is beyond serious dispute." *Smock v. Dir. of Revenue,* 128 S.W.3d 643, 647 (Mo.App.2004).

In Smith's case, he was first asked to submit to a breathalyzer test.  Regardless of the outcome of Smith's breathalyzer test, trooper Elliott had the authority under the statute to request Smith submit to another chemical test; in this instance, a blood test.  Smith did not have a choice as to which chemical test he would take. *Sweatt v. Dir. of Revenue,* 98 S.W.3d 926, 929 (Mo.App.2003); *Snow v. Dir. of Revenue,* 935 S.W.2d 383, 385 (Mo.App.1996); *Borgen v. Dir. of Revenue,* 877 S.W.2d 172, 175 (Mo.App.1994).

■  There is no genuine issue as to whether Smith refused to submit to a blood test.  Smith concedes in his argument that he "did initially refuse the blood test[.]"  Section 577.041.1 provides that once an individual refuses a request to submit to any test allowed under section 577.020.1, "then none shall be given and the evidence of the refusal shall be admissible" in a revocation proceeding.  "Accordingly, an officer is without authority to administer the test once it is refused." *Borgen,* 877 S.W.2d at 175.  "Moreover, '[o]nce it has been properly determined that a driver has refused to submit to a given chemical test, the driver's subsequent request or offer, at a later time, to submit to the same or another chemical test does not alter his [or her] earlier refusal and has no bearing on the revocation of his [or her] license.'" *Id.* (quoting *Blanchard v. Dir. of Revenue,* 844 S.W.2d 589, 590 (Mo.App.1993)).

The facts in this case closely mirror those in *Snow v. Dir. of Revenue,* 935 S.W.2d 383 (Mo.App.1996).  There, the driver was advised of the implied consent law and asked to submit to a breath test, to which she agreed. *Id.* at 384.  When the driver attempted to provide a breath sample three times, the machine failed to make a printout, although the digital readout on the machine indicated a reading of .20. *Id.*  The driver alleged that her asthma prevented her from properly blowing. *Id.*  The arresting officer then asked her to submit to a blood test, and after she agreed, he transported her to a hospital. *Id.*  However, when they arrived, the driver refused, and she was revoked. *Id.*  On the driver's petition for review, the circuit court reinstated her driving privileges for the reason that she attempted to provide a breath sample, and the digital readout was observed by the officer. *Id.*  On appeal, the reinstatement was reversed, as this Court found that because the officer did not request driver to submit to more than two tests, there was no need to determine whether her failure to properly perform

---

**4.** References in this opinion to section 577.020 and its subsections are to RSMo

Cum.Supp.2006.

the breathalyzer test constituted a refusal, because section 577.020 allows an officer to request submission to more than one statutory test. *Id.* at 386.

Regardless of whether or not Smith successfully registered a valid reading during his breathalyzer test, it remained within trooper Elliott's authority to request that he submit to another chemical test. Smith's attempt to submit to the breathalyzer test did not negate his refusal to submit to a blood test. Point I is denied.

### Second Warning was Given or, if Not Given, was Not Required

■ Smith's second point—that · he should have been afforded a second warning of the consequences of refusal when asked to submit to an additional chemical test—affords Smith no relief in two respects.

■ First, trooper Elliott testified that he read to Smith for a second time the implied consent warning prior to asking Smith to submit to the blood test. Smith, on the other hand, testified that he did not recall Elliott so advising him a second time. The trial court's judgment is silent on any credibility determination between these conflicting testimonies. "The trial court is to be accorded wide discretion even if there is evidence that would support a different result and in driver's license revocation cases, when weighing witness credibility, trial courts have the prerogative to accept or reject all, part, or none of the testimony of any witness." *Kisselev v. Dir. of Revenue*, 97 S.W.3d 538, 541 (Mo.App.2003). Thus, accepting as true the evidence favoring the trial court's judgment and disregarding all contrary evidence, *Jarrell*, 41 S.W.3d at 46, Smith was read the implied consent warning a second time before being asked to submit to a blood test.

Second, and irrespective of any implied credibility determination in the judgment, the trial court cited to *Sweatt, supra*, and *Johnson v. Dir. of Revenue*, 168 S.W.3d 139 (Mo.App.2005), in deciding that "the law is clear that the officer had the right to request [Smith] submit to a second test and he was not required to advise [Smith] of the consequences of his failure to do so before administering the second test."

In *Sweatt*, the driver was advised of the implied consent warning and first agreed to submit to a breathalyzer test. 98 S.W.3d at 928. When he could not finish the test, the officer asked if he wanted a blood test. *Id.* The driver answered, "Well, not if I don't have to because I don't like needles better than anyone else." *Id.* When the driver volunteered to submit to another breathalyzer and was again unable to finish the test, the officer reported that driver had refused to submit. *Id.* He also reported that the driver had refused the blood test. *Id.* Upon review of his revocation in the trial court, the driver admitted to declining a blood test. *Id.* at 929. The trial court found that Director had failed to meet its burden in proving that the driver did not knowingly and intentionally refuse to take the blood test and reinstated his driving privileges. *Id.* On appeal, this Court reversed the reinstatement of driving privileges, finding that the driver had been properly notified that his driving privileges would be revoked if he failed to comply with the officer's request for chemical testing and driver had refused the blood test after he failed to properly perform the breathalyzer test. *Id.* at 930. We stated: "The statute [referring to section 577.041.1] does not require that the implied consent form be read before each request to submit to a chemical test." *Id.*

In *Johnson*, after the driver was informed of the implied consent warning, he

was asked to submit to a breathalyzer test, to which the driver agreed and completed. 168 S.W.3d at 140. The result indicated a blood content of .064%. *Id.* When asked to submit to a urine test, the driver refused, and he was subsequently revoked. *Id.* at 141. Following review in the trial court, the revocation was set aside, and Director appealed. *Id.* On appeal, the Western District reversed the trial court's judgment, finding that although the driver successfully completed the breath test, the officer had a right to request that he submit to a second test, and "[n]othing in Section 577.041 required [the officer] to read the implied consent warning again before requesting a second test." *Id.* at 142. In support of its finding that there is no requirement that the implied consent warning be read a second time before requesting a second test, *Johnson* cites to *Baldridge v. Dir. of Revenue*, 82 S.W.3d 212 (Mo.App.2002), where the Western District concluded: "The implied consent law specifically permits two tests and nothing in the plain language of [section] 577.041 requires that the officer read the implied consent warning again prior to requesting a second test." *Id.* at 221. Point II is denied.

### Decision

The trial court's judgment is affirmed.

BURRELL, P.J., and RAHMEYER, J., concur.